IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

**JOSEPH SMITH AND**                                                                                            **PLAINTIFF**
**JOHSUA CARNEY**

**v.**                                                                          **CIVIL ACTION NO. 4:12-CV-93-CWR-FKB**

**TOWER AUTOMOTIVE**                                                                                            **DEFENDANT**
**OPERATIONS USA I, LLC**

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant's Motion for Summary Judgment Against Plaintiff Smith [Docket No. 42] and Motion for Summary Judgment Against Plaintiff Carney [Docket No. 44]. Plaintiffs have responded in opposition [Docket Nos. 48 & 50], Defendant has replied [Docket Nos. 52 & 53], and the matter is ripe for review. The Motions are GRANTED IN PART and DENIED IN PART.

### I.   Background

This action grows out of Defendant Tower Automotive Operation's ("Tower") adverse employment actions taken against Plaintiffs Joseph "Jody" Smith and Joshua Carney. Each was suspended for sleeping past the time allowed for a lunch break. They then were terminated, when after its investigation, Tower concluded that Smith and Carney filed a false internal complaint accusing one of their supervisors, Terry Koopman, of making racially offensive statements. In other words, Tower contends that the Plaintiffs lied on Koopman because he wrote them up.

Plaintiffs, however, argue that Tower's assertion of cause and effect is wrong. They contend their termination was the result of retaliation by Tower for having accused Koopman of making racially-discriminatory remarks in violation of 42 U.S.C. § 2000e–3(a). *See* Docket No.1. The pertinent facts are as follows:

Tower is a manufacturer of structural components and assemblies used by the automotive industry. Mem. in Supp. of Mot. for Summ. J. against Pl. Smith, Docket No. 43, at 2. Plaintiffs, two Caucasian males, were maintenance workers at one of Tower's manufacturing plants located in Meridian, Mississippi. *See* Mem. in Opp. to Def. Mot. for Summ. J., Docket No. 48, at 1, 3. As maintenance workers, their duty was to make sure cells[1] were properly functioning at all times. Docket No. 42-1, Exhibit A, at 37 (Smith Dep.).

When they were hired, Plaintiffs signed and received employee handbooks. Docket No. 43, at 2. The anti-harassment policy of the employee handbook states that any person that is "the victim of illegal harassment or improper conduct must report it immediately" to the Human Resource (HR) Manager, Jamie Graham, or the Plant Manager, Darnell Montgomery. *See id*. at 2-3. After Tower is notified of the misconduct or harassment, the policy states that it "will conduct or direct a prompt investigation of the allegations. Upon completion of the investigation, the results will be reviewed by the Plant Manager and/or HR Manager, and any others, as is appropriate, with an appropriate action decided upon." Docket No. 42-4.

The policy also lists examples of conduct for which disciplinary action would be taken:

> 9. Misrepresentation and/or falsification of records, attendance reports, documents, or any other information used or required by the Company.
>
> \* \* \*
>
> 15. Sleeping during working time.
>
> \* \* \*
>
> 39. Leaving early and reporting late from designated lunch or break periods.

---

[1] A cell, as it is described by Plaintiff Smith, is a point at which a part is prepared and assembled to be shipped or transferred to another cell. For example, as it relates to Plaintiffs' jobs, a piece of metal that is part of an interior of a Nissan vehicle would be positioned in a cell so that a robot could place nuts on it and set it in a pedestal. Docket No. 42-1, Exhibit A, at 37. Then, "[a] well robot would come in and put wells where they were necessary and then set it on the end cap to be unloaded, checked out by the operator, and put in a basket to be shipped or either to go to another cell." *Id*.

Docket No. 42-5. Tower reserved the right to discharge an employee, not only for the listed misconduct, but for other misconduct as the list is not "all-inclusive". *Id*., at 2.

### A. Racial Remarks Allegedly Made by Terry Koopman in August, 2011

On or around August 21, 2011, Plaintiffs claim that they heard the production supervisor, Terry Koopman, make racially derogatory statements about black people to a group of white employees in the break room at the plant. Jody Smith's signed statement, which was not turned into HR until September 14, 2011, described the events as follows:

> While sitting in the break room on lunch break during the week of August 21-25, Terry Koopman, 3rd shift production supervisor came in the break [room] and joined myself, Josh Carney, Tammy Morgan, and Rob Walsh. Terry made racial remark[s] about the Labor Day jazz festival that was on the table in the break room. The remark was can you imagine all the chicken and barbeque ribs that will be eaten at this thing, you know all them brothers have got to have their barbeque, also said he needed to get him suit of clothes so he can match the brother, all was spoken in street slang. Also on lunch, same people eating together on another night of the same week a remark to the effect that our company picnic would be … about the same as the jazz festival with all the blacks that are going to be there. I hope they cook plenty of chicken.
>
> . . . .
>
> While Terry was leaving the break room, Randy Griffin was coming in and came up to our table while we were discussing what Terry had said, that Terry should watch what he says, Randy over heard this remark and asked what was said and we told him and he agreed that was inappropriate.

Docket No. 49-22. Carney also claimed to have heard Koopman's comments. Docket No. 44-18. Carney did not submit his statement to HR until September 15, 2011. Docket No. 49-17.

Smith's statement also included another incident where he alleges Koopman made comments invoking racist sentiments towards a black employee:

3

> On the week between August 28 – [September, 2011], one of the nights, after getting up from lunch and exiting the break room[,] Terry Koopman was telling Ethel [Clark, an African-American woman], what he wanted her to move in shipping, she replied that something else was in the way of it and he hastily told her to move what was in the way and get what he wanted, she drove off, he looked at me and said that one there is so stupid the only reason she has a job is because she is black, if she was white she would be gone. The whole time he was saying this he was rubbing the top of his hand.

Docket No. 49-22. No one else was present when this statement was allegedly made.

These alleged statements remained unreported to HR (as required by the policy) until September 14, 2011. However, Carney claims to have reported the remarks to his supervisor, Randy Griffin (third shift maintenance supervisor), immediately after the statements were made. Because Griffin agreed that the statements were inappropriate, Carney believed that Griffin would take corrective action. Docket No. 44-1, at Exhibit A, at 62-3 (Carney Dep.). As explained in more detail below, Griffin denies being told anything prior to Koopman issuing write-ups against Plaintiffs for sleeping on the job. Docket No. 44-19, at Exhibit S, at 34 (Griffin Dep.). Additionally, Koopman denies making any of these statements. *See* Docket No. 44-6, at Exhibit F, at 10 (Koopman Dep.) ("I did not say that. . . I didn't say that. I didn't say anything to that nature.").

### B. Plaintiffs' Suspension

On September 6, 2011, nearly two-weeks after the alleged racially offensive remarks were made, Koopman wrote up both Plaintiffs for "sleeping during work time." Docket Nos. 42 and 44. According to Plaintiffs, Koopman began mistreating them after Carney told Griffin of Koopman's "inappropriate" statements. That mistreatment culminated into the write-ups, and the write-ups, put simply, were retaliation. Docket No. 48, at 3.; Docket No. 50, at 3.[2] However,

---

[2] Plaintiffs' brief offers testimony of Ethel Clark to support their claim that Koopman had a "negative attitude" towards them. *See* Docket No. 50, at 3; Docket No. 42-22, at Exhibit V, at 6-9 (Clark Dep.). It is not clear, however,

4

Koopman denies ever having knowledge that Plaintiffs accused him of making racially offensive comments until after they submitted their written statements to HR. Docket No. 44-6, at 7.

### i. Plaintiff Smith

Smith began working for Tower in electrical maintenance in October 2009. Complaint, Docket No. 1, at 2. His duty hours were 10:40 p.m. to 7:10 a.m. Docket No. 49-19, at Exhibit 19, at 36 (Smith Dep.). His lunch period was from 2:00 a.m. to 2:30 a.m. *Id*. at 46. On September 6, 2011, Smith was working a start-up night,[3] a night in which Griffin, according to Smith and Carney, permitted them to take an extra thirty minutes for their break period.[4] *Id*. at 45. On that day, however, Koopman (third shift productions supervisor) was in charge[5] and was unaware of Griffin's tacit approval of deviation from company policy, which allowed only thirty minutes for the break period. *See id*. at 45-46; *see also* Docket No. 42-5.

Smith suffered from a migraine headache that night. He says that after he finished running all the cells, he went to his truck to take a nap at the start of his lunch-break at 2:00 a.m. *Id*. at 41. Around forty minutes later, Koopman approached Smith's truck, knocked on his window, and told him to return back to work. Docket No. 49-19, at 47, 51. Smith claims that Koopman told him to "get [his] ass back in there and go to work," to which Smith replied, "…why don't you just go ahead and write me up then…." *Id*. at 51. Koopman claims that Smith

---

whether Clark knows if this was due to the fact that Koopman was aware that Carney informed Griffin of the alleged racial remarks.

[3] A start-up night is a night in which there are no operators running the machines and where Plaintiffs would run parts and check them to ensure proper functioning for the first shift of operators. *See* Docket No. 49-19, at Exhibit 19, at 36 (Smith Dep.).

[4] Although Griffin allowed the extra time, Smith testified that he never actually had taken an hour-long lunch break. Docket No. 49-19, at 13.

[5] Griffin serves as Plaintiffs' direct supervisor, however, on occasion, when Griffin was not present, Koopman would serve as their supervisor. *Id*. On September 6, 2011, Griffin did not work because he hurt his foot. Docket No. 51-7, at 17.

was asleep because, when he knocked on the window, "[Smith] appeared startled, like he had just woken up." Docket No. 44-6, at 18. Smith, however, denies that he was sleeping when Koopman approached his truck. Koopman issued a write-up for "sleeping during work time," and signed it on September 6, 2011. Docket No. 42-8.

### ii. Plaintiff Carney

Joshua Carney began working for Tower as an industrial maintenance employee in October 2006.[6] Docket No. 1, at 2. He worked the third shift, which was from 11:00 p.m. until 7:00 a.m. Pl. Carney's Mem. in Opp. Mot. for Summary Judgment, Docket No. 50, at 4. His lunch period was from 2:00 a.m. until 2:30 a.m. *Id*. On September 6, 2011, Carney began resting during his lunch break because he suffered from a stomach illness. Docket No. 51-1, at Exhibit 1, at 37. According to Carney:

> [H]e went to the destruct room and laid his head on the table for around 15 or 20 minutes. He then went to the bathroom and returned to the deconstruct room. Around 10 minutes later, Koopman opened the door and said "wake up." [He] was not asleep and when Koopman opened the door [he] raised his head up from the table. [H]e went back to work and nothing else was said the rest of the night.

Docket No. 51-12, at 11 ("Joshua Carney's Response to Interrogatory No. 19").

Koopman disagrees. He contends that Carney was in the room sleeping past his break period. Docket No. 44-6, at 21 (Koopman Dep.). During his deposition, when asked how did he know that Carney was sleeping, Koopman explained, "If a person is in a room in the dark for over an hour with their head down, they're pretty much sleeping. I can't prove it, no, but perception is 90 percent of reality, so he must have been sleeping, you know." *Id*.

---

[6] Carney resigned in October 2010, but began working for Tower again in December 2010. Docket No. 51-1, at 26-29 (Carney Dep.).

During the same hour he had written-up Smith, Koopman wrote-up Carney for "sleeping during work time." Docket No. 50, at 5. Carney did not sign the write-up form because he did not want to concede that he was sleeping. *Id*.

### iii. Plaintiffs' Termination

On September 7, 2011, each Plaintiff had a disciplinary meeting based on their write-ups. Rick Mills (operations manager), Dave Gresham (area manager), Koopman, and Angela Bednark (HR Generalist) attended each meeting. Docket Nos. 51-15, 51-25. Following their meetings both Plaintiffs were suspended without pay. Docket No. 49-19, at 18.

After his meeting, Smith alleges that Griffin motioned for him and Carney to come into his cubicle, after which he inquired as to whether they ever reported the remarks Koopman made in the break room. Docket No. 49-19, at 18. Smith claims that Griffin also told them that they should write down a statement explaining what Koopman said and ask Bednark how to proceed. Docket No. 50, at 10. Smith submitted a statement to HR on September 14. Before turning in that statement, however, Smith informed Carney, Walsh and Morgan (the persons allegedly present when Koopman made his statements) that he would be turning something in that would mention them. Docket No. 49-19, at 19.

On Monday, September 12, 2011, Angela Bednark called Plaintiffs to inform them that they could return to work the following day. The suspensions would stand, and they would receive a write-up that "would serve as the last warning for [that] type of offense." Docket Nos. 49-15, 51-25.

Acting on Smith's written complaint from the previous day, on September 15, 2011, Tower began investigating Smith's complaint by interviewing several employees, including Smith, Carney, Walsh, Morgan, Griffin, and Donald Patrick (who was not actually present when

7

Koopman's alleged statements were made).[7] Rick Mills, Jamie Graham, and Bednark supervised these interviews.

Walsh was interviewed twice. During his first interview, he insisted that he only remembered vaguely the incident which was the subject of Smith's complaint.[8] He, however, did recall some details:

> Terry picked up the flyer and said can you imagine the amount o[f] ribs and chicken that will be served [t]here. The statement could have been taken offensively and I took it as a racial remark.[9] In a way[,] it could have been considered racial. That was the only thing I can . . . remember.

Docket No. 51-27. He also made it clear that "[he didn't] like to be pulled into stuff." *Id*. Apparently, because of Walsh's demeanor, Graham doubted Walsh's veracity. *See* Docket No. 42-11, at Exhibit K, at 24-25 (Graham Dep.) (". . . his body language . . he squirmed. . . it appeared that he was not being as upfront or factual as he could have been."). The interviewers, therefore, sought a second interview with Walsh to verify whether he was being honest. Docket No. 51-28. At that second interview, Walsh reiterated that Koopman made statements he believed to be racially insensitive, however, he also admitted that he was not being honest when he told them previously that he did not meet with Smith before his first interview. *Id*.

During Tammy Morgan's interview, she stated that she remembered the jazz flyer, but she "[n]ever heard [Koopman say] any racial slurs" and has "[n]ever heard him say anything

---

[7] In Jamie Graham's deposition, when asked why Patrick was interviewed when he was not an eyewitness to Koopman's alleged statements, Graham replied, ". . . based on the nature of the complaint, . . . I wanted to speak to as many employees as I felt could give me a picture of Terry Koopman as a supervisor." Docket No. 42-1, at Exhibit 11, at 8 (Graham Dep.).

[8] Walsh testified that had Smith not approached him before issuing his statement, he would not have remembered any of the statements Koopman allegedly made. Docket No. 51-26, at 21 (Walsh Dep.).

[9] In his deposition, Walsh suggested that nobody found Koopman's comments to be offensive at the time they were made. Docket No. 51-26, at 24. But in that same deposition, he acknowledged that if black people were present, they "more than likely" would have found Koopman's remarks to be offensive. *Id*. He further stated that he believed Smith and Carney reported the statements only because they were written-up. *Id*.

racial to anybody." Docket No. 49-29. Donald Patrick also stated that he had never heard Koopman say anything racially offensive. Docket No. 50, at Exhibit 14 (Donald Patrick Interview Notes). During his deposition, Randy Griffin testified to hearing Koopman making a statement about chicken and ribs in the break room, but when interviewed during the investigation, he did not tell Mills or Graham about hearing it because he "didn't think it was that big a deal."[10] Docket No. 51-7, Exhibit 7, at 23-25 (Griffin Dep.).

After the interviews were conducted, Tower reviewed the notes of each meeting and concluded that Plaintiffs filed "a retaliatory false claim against [Koopman]" because he wrote them up. Docket No. 42-11, at 10. Graham concluded that there was "no supporting evidence that Terry had in any way made those comments." *Id*. On September 19, 2011, Tower issued a letter to both Plaintiffs notifying them that they were terminated. *Id*. Subsequently, Smith and Carney, on October 3 and 7, respectively, filed EEOC charges claiming retaliation. Docket Nos. 1-2, 1-4. Plaintiffs received their right to sue letters and, on June 5, 2012, they jointly filed this suit to recover actual and punitive damages for Tower's unlawful retaliation under Title VII of the Civil Rights Act of 1964. Docket No. 1.

## II. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When confronted with these motions, the Court focuses on "genuine" disputes of "material" facts. A dispute is genuine "if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party." *St. Amant v.*

---

[10] Smith testified that on Thursday, September 15, 2011, Griffin called him and asked not to mention his name because Rick Mills told Griffin that he would lose his job if he did not stay out of it. Docket No. 49-19, at 19. Griffin denies this claim.

*Benoit,* 806 F.2d 1294, 1297 (5th Cir. 1987). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1)(A). The Court will "view the evidence and draw reasonable inferences in the light most favorable to the non-movant," *Maddox v. Townsend & Sons, Inc.,* 639 F.3d 214, 216 (5th Cir. 2011) (citations omitted), but unsubstantiated assertions are not competent summary judgment evidence, *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994).

This Court is ever mindful that although a useful device, summary judgment "must be employed cautiously because it is a final adjudication on the merits." *Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989); *Hulsey v. State of Texas*, 929 F.3d 168, 170 (5th Cir. 1991). The jury has the responsibility to assess the probative value of the evidence. As a consequence, a court must step back and not make any credibility determinations, and it must not weigh evidence or draw from the facts legitimate interferences for the movant. *Strong v. Dept. of Army*, 414 F.Supp.2d 625, 628 (S.D. Miss. 2005). *See also Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478 (5th Cir. 2006) (explaining that a court cannot weigh the evidence or evaluate the credibility of witnesses when considering a motion for summary judgment). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes the better course would be to proceed to full trial." *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (citations and quotation marks omitted).

### III.   Analysis/Discussion

**A.  Retaliation Claim**

Plaintiffs may establish "a prima facie case for unlawful retaliation by proving (1) that [they] engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir.1996) (citation omitted). The burden then shifts to the Defendant, which must state a legitimate, non-retaliatory reason for its actions. *Id*. at 305. If Defendant meets this burden, Plaintiffs must show that the given reason is only pretext for the real retaliatory purpose, "which [Plaintiffs] accomplish[] by showing that the adverse action would not have occurred '**but for**' [Tower's] retaliatory motive." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (emphasis added) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, ___ U.S.___, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)). "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id*. at 454 (citation omitted). Such is the framework on which Defendant's motions shall be reviewed.

### 1. Write-up

In response to Defendant's motion, Plaintiffs argue that Tower committed unlawful retaliation on two occasions: when Koopman wrote them up and when they were terminated. Docket No. 48, at 22. Plaintiffs argue that the write-ups were Koopman's retaliation against them for verbally reporting his alleged racist comments to their supervisor, Randy Griffin. *Id*. Plaintiffs contend that Koopman's attitude towards them changed after they informed Griffin of Koopman's comments which, according to Plaintiffs, is evidence that Griffin alerted Koopman of Plaintiff's actions against him. *Id*. at 23. But, Tower contends that Plaintiffs have not shown that it retaliated against Plaintiffs with respect to their suspension. The Court agrees.

Although Plaintiffs engaged in protected activity by allegedly reporting Koopman's statements, and, their suspensions constituted adverse action, Plaintiffs lack evidence showing that this activity was causally related to their write-ups. In addition to Griffin's testimony that Plaintiffs never told him of Koopman's alleged comments until they were suspended, Koopman also testified that he was not aware of the allegation that Plaintiffs told Griffin that he had made racially derogatory comments. Plaintiffs have provided no proof that could lead a jury to reasonably believe Koopman knew that Plaintiffs reported him to Griffin. Instead, Plaintiffs speculate that the mere fact that Koopman treated them differently and eventually wrote them up proves that he had knowledge of them alerting Griffin of his statements. *See* Docket No. 48, at 22-23.

The record does not substantiate the conclusion Plaintiffs attempt to make. Plaintiffs, therefore, are unable to rebut Koopman's testimony that he did not know of Plaintiffs' actions. As such, Plaintiffs do not have a claim of unlawful retaliation based on their write-ups and ultimate suspensions because Koopman did not know Plaintiffs engaged in protected activity before he wrote them up. Simply put, the write-ups were *non-retaliatory*. *See Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999) (holding that Plaintiff could not have retaliated against Defendant, because Defendant did not know Plaintiff had engaged in protected activity (citing *Long v. Eastfield College*, 88 F.3d 300, 305 n.4 (5th Cir. 1996))). Thus, summary judgment is granted as to Plaintiffs' retaliation claim related to their write-ups and suspensions.

### 2. Termination

The terminations are a different story and lead the Court to a different conclusion. For starters, Tower concedes that Plaintiffs can establish a *prima facie* case for retaliation. Plaintiffs, for their part, concede that Tower has offered a legitimate nondiscriminatory reason for

terminating them. The question that remains, however, is whether the Plaintiffs can show pretext by establishing that Defendant's retaliatory motive was the "but-for" cause of the adverse actions taken against Plaintiffs.

Tower explains that Plaintiffs were terminated because Tower's investigation led it to reasonably believe that Koopman did not utter the comments Plaintiffs accused him of saying. *Id.* at 14. In its Motion for Summary Judgment, Tower takes issue with whether Plaintiff can show pretext. Tower argues that Plaintiffs cannot meet the strict "but-for" standard required in *Nassar*. Docket No. 43, at 13. To buttress its position, Tower wraps its arms around the Supreme Court's comments regarding "frivolous" claims in *Nassar* to show that Plaintiffs' actions are of the type which *Nassar* specifically seeks to prevent:

> Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation. If respondent were to prevail in his argument here, that claim could be established by a lessened causation standard, all in order to prevent the undesired change in employment circumstances. Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage.

*Nassar*, 133 S.Ct. at 2532.

Tower stated that it conducted a thorough investigation which adhered to its usual procedures when handling complaints of discriminatory conduct. This investigation led it to conclude that Plaintiffs, like the hypothetical plaintiff the Supreme Court described in *Nassar*, fabricated a story against Koopman in anticipation of the possibility of being terminated for being caught "sleeping during work time."

Plaintiffs contend that "[t]here is, at the least, an issue of fact as to whether Carney and Smith lied to Tower." Docket No. 42, at 22. They also argue that Tower's investigation was a sham. *Id*. Consequently, they contend that "[t]he jury in this case must decide whether Carney and Smith lied about Koopman's racist statements and . . . whether Tower is being truthful in its claim that it believed Carney and Smith were being dishonest." *Id.*. The Court agrees.

Although Plaintiffs' claim appears to resemble the hypothetical one mentioned in *Nassar*, the Court finds that the facts demonstrate that there are, as Plaintiffs argue, fact issues as to whether Plaintiffs actually fabricated their story and whether Tower conducted a bad faith investigation so that Plaintiffs could be terminated for filing their report.

Plaintiffs presented evidence showing that at least three (Carney, Smith and Walsh) out of the six employees present in the break room heard Koopman say something that could have been perceived as racially offensive.[11] Although Morgan stated that she did not remember whether Koopman made those statements, she never stated that Plaintiffs were being dishonest. In addition, Griffin (a Tower supervisor), during his deposition, also admitted to hearing Koopman talk about "chicken and ribs," but did not know the context in which those words were being mentioned. Thus, Koopman is the only person who definitively denies that the statements were ever made. And Tower, the defendant here, concurs with Koopman. A jury should be allowed to test Graham's definitive finding that there was "*no supporting evidence* that [Koopman] had *in any way* made those comments." Docket No. 42-11, at 10 (emphasis added).

Moreover, Plaintiffs offer evidence that may call into question whether Tower's investigation was made in good faith. In Walsh's first interview with Tower, he admitted that

---

[11] Although Walsh could not remember whether Koopman said exactly what Plaintiffs accused him of saying, he did tell Tower during its investigation that he remembered hearing Koopman make a comment about "chicken and ribs," which he interpreted as a "racial remark." As stated, *supra* n. 9, he believed, if a black person had heard Koopman's statements, they would have "more than likely" found it to be offensive.

14

Koopman made statements he interpreted as racially offensive. When Tower completed its initial round of interviews, Plaintiffs and Walsh were the only ones who stated they could recall Koopman making derogatory comments. The Tower interviewers doubted Walsh's credibility and chose to interview him a second time.

Plaintiffs contend that Tower interviewed Walsh again because his first interview was unfavorable to Koopman. Plaintiffs noted that during his second interview, Rick Mills asked Walsh such questions as, "How much do you value your job? Do you value your job over your friendship with Jody?" Docket No. 51-28. Plaintiffs suggest that these statements were made in order to pressure Walsh into retracting his statement that Koopman made a "racial remark." Docket No. 50, at 12. In fact, during Walsh's deposition, when asked whether he felt pressured into changing his story that Koopman made the alleged comments, Walsh replied, ". . . yes, they were pressuring me. . ." Docket No. 51-26, at 23. These actions by Tower can be reasonably perceived as pressuring Walsh into altering the truth to secure its desire to find *no supporting evidence* that Koopman had *in any way made the comments*; thus, absolving Koopman and creating cause for Plaintiffs to be terminated.

In addition, Plaintiffs also argue that Mills threatened to terminate Griffin if he got involved. Although Griffin denies this claim, the record provides support for Plaintiffs' assertion. As previously stated, in his deposition, Griffin admitted to hearing Koopman make statements about "chicken and ribs," yet he failed to mention this particular fact when Tower interviewed him for purposes of discovering whether the allegations against Koopman were true. As one of Tower's supervisors, this omission is a glaring one because it is a material statement that could have provided additional punch to Plaintiffs' allegations against Koopman. In light of Griffin's

15

material omission during the investigation, it is plausible that a jury may find that the omission was an intended consequence of Mill's threat to terminate Griffin if he got involved.

Viewing this evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have presented sufficient evidence to create a fact issue as to their reasonable belief that Defendant's decision to terminate them violated Title VII. Plaintiffs' evidence, if believed, would permit a jury to conclude that Tower would not have terminated Plaintiffs but for their complaint against Koopman.

### B. Punitive Damages

Tower has also moved the Court for summary judgment as to Plaintiffs' claim for punitive damages. According to the Fifth Circuit,

> Punitive damages in a Title VII case are recoverable if the plaintiff shows that the defendant acted with malice or with reckless indifference to the federally protected rights of an aggrieved individual. This standard is higher than the showing necessary for compensatory damages. We have cautioned that not every sufficient proof of pretext and discrimination is sufficient proof of malice or reckless indifference. Nevertheless, a plaintiff need not show the defendant's conduct was especially egregious, as the availability of punitive damages turns on the defendant's state of mind, not the nature of the defendant's egregious conduct. This is a subjective inquiry and focuses on whether the employer at least discriminated in the face of a perceived risk that its actions will violate federal law. For example, an employer that is unaware of the relevant federal prohibition or that acts with a justifiable belief that its discrimination is lawful will not be liable for punitive damages. Moreover, under a good faith exception, an employer will not be liable for punitive damages based on the discriminatory actions of its managerial agents if those actions are contrary to the employer's good faith efforts to comply with Title VII.

*Smith v. Xerox Corp.*, 602 F.3d 320, 334 (5th Cir. 2010) (internal citations and quotation marks omitted). The Court finds that a ruling on the punitive damages claim is premature at this juncture, as the Court is not armed with enough knowledge to determine whether Plaintiffs meet this standard. Thus, the Court will defer its ruling until after the presentation of proof at trial. *See*

*Curry v. Hollywood Casino Corp.*, No. 2:11cv195, 2013 WL 1291762, at *7 (N.D. Miss. March 28, 2013); *E.E.O.C. v. Landau Uniforms, Inc.*, No. 2:11cv201, 2012 WL 6013409, at *6 n. 3 (N.D. Miss. Dec. 12, 2012).

### IV. Conclusion

For the reasons stated above, the Court finds that Defendant's Motions for Summary Judgment are denied with the exception of Plaintiffs' claim that their write-ups constituted unlawful retaliation in violation of Title VII.

**SO ORDERED**, this the 3rd day of December, 2013.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE